Stephen C. Mouritsen (16523)
Briggs J. Matheson (18050)
PARR BROWN GEE & LOVELESS
101 South 200 East, Suite 700
Salt Lake City, UT 84111
801-532-7850
Email: smouritsen@parrbrown
          bmatheson@parrbrown.com

*Attorneys for Plaintiff Allied World Surplus Lines Insurance Company*

**IN THE UNITED STATES DISTRICT COURT**

**DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| ALLIED WORLD SURPLUS LINES INSURANCE COMPANY, <br><br>       Plaintiff, <br><br> vs. <br><br> MOUNTAIN COUNTRY PET CARE, LLC d/b/a MOUNTAIN COUNTRY FOODS, LLC <br><br>       Defendant. | **COMPLAINT** <br> **AND** <br> **JURY DEMAND** <br><br> Case no. 2:22-cv-00046-DAO <br><br> Magistrate Judge Daphne A. Oberg |

**<u>COMPLAINT</u>**

Plaintiff, Allied World Surplus Lines Insurance Company ("Allied World"), by its attorneys, Parr Brown Gee & Loveless, as and for its Complaint against Defendant, Mountain Country Pet Care, LLC d/b/a Mountain Country Foods, LLC ("MCF" or "Defendant"), respectfully alleges as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this action and venue lies in this district, pursuant to 28 U.S.C. §§ 1332, 1391, 2201, and 2202.

2.      Jurisdiction is proper in this Court, because Defendant MCF's principal place of business and corporate offices are located in Spanish Fork, Utah.

3.      Jurisdiction is proper in this Court because MCF manufactured the product at issue at their facility located in Spanish Fork, Utah, from which the claimed Loss originated.

4.      MCF is subject to personal jurisdiction within this judicial district at the time this action was commenced.

5.      There is diversity among the parties.

6.      There exists an actual controversy in excess of $75,000 within this Court's jurisdiction. The parties are also entitled to a declaration of their respective rights and other legal relations.

## THE PARTIES

7.      That at all times hereinafter mentioned, Plaintiff Allied World is a foreign corporation, duly organized and existing under and by virtue of the laws of the State of Arkansas

8.      Upon information and belief, at all times hereinafter mentioned, Allied World has its office and principal place of business located in New York, New York.

9.      Upon information and belief, at all times hereinafter mentioned, Defendant MCF is duly organized and existing under and by virtue of the laws of the State of Oklahoma.

10.     Upon information and belief, at all times hereinafter mentioned, MCF has its corporate offices and principal place of business in the State of Utah.

## THE PRODUCT CONTAMINATION POLICY

11.     This matter is an insurance coverage dispute arising out of a claim submitted under a product contamination insurance policy issued by Allied World to MCF under Policy No. 0312-6744, in effect from January 2, 2021, to January 2, 2022 ("the Policy").

12.     In this action, Allied World seeks a declaration that the Policy does not cover a Loss claimed by MCF because the Policy's coverage was not properly triggered, the claim is precluded from coverage, the claim is excluded from coverage, and MCF misrepresented or omitted material information in its Product Contamination Application (the "Application").

13.     The Policy issued by Allied World to MCF was a claims-made-and-reported Product Contamination Policy – Food and Beverage, which contains an Accidental Contamination Adverse Publicity Each Incident Sublimit of Insurance in the amount of $5,000,000 and a Governmental Determination Each Incident Sublimit of Insurance in the amount of $5,000,000 excess a $350,000 Retained Limit.  A true copy of the Policy is attached hereto as Exhibit A.

14.     The Policy's Insuring Agreement provides as follows,

    I:      Insuring Agreement
            A.      We will reimburse you for **Loss** caused by an **Incident** of:

                    1.      **Accidental Contamination**;
                    2.      **Malicious Contamination**; or
                    3.      **Product Extortion**;

                    first discovered and reported to us during the **Policy Period**,
                    or within sixty (60) days thereafter.

15.     The Policy contains Exclusions in Section III, including the following:

    **III.    EXCLUSIONS**

    A.      The policy does not provide coverage for any **Loss** or related **Incident Response Fees** arising out of, in whole or in part:

3

1. **Bodily Injury**, mental anguish, mental injury, shock or humiliation resulting from any of these at any time, sustained by any person, including your employees and their heirs;

2. physical injury sustained by any animal; or

3. property damage or physical injury to tangible property, including all resulting loss of use of such property, or loss of use of tangible property that is not physically injured.

* * *

C. This policy does not provide coverage for any **Loss** or related **Incident Response Fees** arising out of, in whole or in part, any **Incident** or any circumstance that could give rise to an **Incident**, which you discovered or was known, or should have reasonably been known, prior to the inception of the Policy Period.

16.    The Policy contains an Accidental Contamination Adverse Publicity Endorsement, which provides in relevant part:

### ACCIDENTAL CONTAMINATION ADVERSE PUBLICITY ENDORSEMENT

All of the policy's terms, conditions and exclusions not amended below apply to the coverage provided by this endorsement.

It is agreed that this policy is amended as follows:

A. The Declarations are amended to include the following additional items:

Accidental Contamination Adverse Publicity Each Incident Sublimit of Insurance: $5,000,000

Accidental Contamination Adverse Publicity Aggregate Sublimit of Insurance: $5,000,000

Accidental Contamination Adverse Publicity Retained Limit: $350,000

B. Section **II. LIMITS OF INSURANCE** is amended to include the following additional provision:

Subject to the Accidental Contamination Adverse Publicity Aggregate Sublimit of Insurance shown in the Declarations (as amended above), the most we will pay for your **Loss** because of **Adverse Publicity** arising from **Accidental Contamination**, in excess of the Accidental Contamination Adverse Publicity Retained Limit shown in the Declarations (as amended above), as a result of one **Incident**, is the

4

Accidental Contamination Adverse Publicity Each Incident Sublimit of Insurance shown in the Declarations (as amended above). All **Adverse Publicity** arising from the same omission, introduction, or error will be considered as arising out of one **Incident**.

Subject to the Policy Aggregate Limit stated in Item 3.F. of the Declarations, the Accidental Contamination Adverse Publicity Aggregate Sublimit of Insurance is the most we will pay under this endorsement for the sum of all damages because of **Adverse Publicity** arising from **Accidental Contamination**.

C.   Solely for the purpose of this endorsement, Section **V. DEFINITIONS**, Definitions A. **Accidental Contamination** and B. **Adverse Publicity** are deleted in their entireties and replaced by the following:

A.   **Accidental Contamination** means any inadvertent or unintentional contamination or mislabeling of any **Insured Products**, which occurs during or as a direct result of its production, preparation, manufacture, packaging or distribution, provided that the use or consumption of such **Insured Products** has:

1.   resulted or would result in bodily injury, sickness or disease, including death, of any person(s), within three hundred and sixty five (365) days following such use or consumption; or

2.   caused or would cause physical damage to or destruction of tangible property, other than **Insured Products** themselves.

**Accidental Contamination** includes creating **Adverse Publicity**.

B.   **Adverse Publicity** means the reporting of an actual or alleged **Accidental Contamination** or **Malicious Contamination** during the **Policy Period** in:

1.   local, regional or national media (including but not limited to radio, television, newspapers, magazines, or the internet); or

2.   any governmental publication;

where the **Insured Products** are sold or distributed and where the **Insured Products** is specifically named.

17.   The Policy also contains a Governmental Determination Endorsement which states that,

5

### GOVERNMENTAL DETERMINATION ENDORSEMENT

All of the policy's terms, conditions and exclusions not amended below apply to the coverage provided by this endorsement.

It is agreed that this policy is amended as follows:

A.  Solely with respect to any coverage provided by this endorsement, the Declarations are amended to include the following additional items:

Governmental Determination Each Incident Sublimit of Insurance: $ 5,000,000

Governmental Determination Aggregate Sublimit of Insurance: $ 5,000,000

Governmental Determination Retained Limit: $ 350,000

B.  Solely with respect to any coverage provided by this endorsement, Section **I. INSURING AGREEMENT**, Paragraph A. is amended to contain the following additional provision:

We will also reimburse you for **Loss** caused by an **Incident** of **Governmental Determination** first discovered and reported to us during the **Policy Period**, or within sixty (60) days thereafter.

C.  Solely with respect to any coverage provided by this endorsement, Section **II. LIMITS OF INSURANCE** is amended to include the following additional provision:

Subject to the Governmental Determination Aggregate Sublimit of Insurance shown in the Declarations (as amended above), the most we will pay for all damages because of **Governmental Determination** under this endorsement, in excess of the Governmental Determination Retained Limit shown in the Declarations (as amended above), as a result of one **Incident**, is the Governmental Determination Each Incident Sublimit of Insurance shown in the Declarations (as amended above).

Subject to the Policy Aggregate Limit stated in Item 3.F. of the Declarations, the Governmental Determination Aggregate Sublimit of Insurance is the most we will pay under this endorsement for the sum of all damages because of **Governmental Determination** under this endorsement.

D.  Solely for the purposes of this endorsement, Section **III. EXCLUSIONS**, Exclusion I. is deleted in its entirety.

6

E.  Solely with respect to any coverage provided by this endorsement, Section **V. DEFINITIONS**, Definition J. **Incident** is amended to contain the following additional provision:

**Incident** also means **Governmental Determination**.

With respect to **Governmental Determination**, individual orders or recommendations by the relevant regulatory authority(ies) shall be deemed to be one **Incident** if such orders or recommendations involve the withdrawal, removal, recovery of possession or control, or disposal of your **Insured Product** because of the same or substantially similar contamination or mislabeling of your **Insured Product**.

F.  Solely with respect to any coverage provided by this endorsement, Section **V. DEFINITIONS**, Definition G. **Government Recall** is deleted in its entirety and replaced by the following:

G.  **Governmental Determination** means the:

1.  recall;

2.  withdrawal;

3.  removal;

4.  recovery of possession or control; or

5.  disposal;

of your **Insured Product** from a distributor, purchaser, or user of such **Insured Product**, provided such action, described in subparagraphs 1. through 5. above, was conducted voluntarily or involuntarily pursuant to:

a.  an order or recommendation by a relevant regulatory federal, state, or local authority(ies), including the Food and Drug Administration (FDA), the United States Department of Agriculture (USDA) or Canadian Food Inspection Agency, based solely on a determination by such regulatory authority(ies) that the use or consumption of such **Insured Product** is reasonably likely to result in **Bodily Injury** to persons or physical damage to any domestic pet;

b.  an order of suspension of registration of your facility or plant based solely on a determination by the FDA or USDA that your **Insured Product** has been manufactured, processed, packed, received, or held in such facility or plant and has a reasonable probability of causing serious adverse health consequences or death to humans or physical damage to any domestic pet; or

    c.  outside of The European Union, The United Kingdom, The United States or America, or The Dominion of Canada, the recall or ban of your **Insured Product** has been ordered by a country's regularly constituted national, federal, state, provincial, or local regulatory agency or judicial body pursuant to food safety regulations and the actual contamination of such **Insured Product** has resulted or would result in **Bodily Injury** to persons or physical damage to domestic pets within three-hundred-sixty-five (365) days following such use or consumption.

18.    The Policy's Third-Party Product Recall Liability Damages Coverage Endorsement provides in relevant part:

### THIRD PARTY PRODUCT RECALL LIABILITY DAMAGES COVERAGE
### (WITH COMBINED RETAINED LIMIT)

All of the policy's terms, conditions and exclusions not amended below apply to the coverage provided by this endorsement.

It is agreed that this policy is amended as follows:

A.  The Declarations are amended to include the following additional items:

**Third Party Product Recall Liability Damages**
Each **Recall of Insured Products** Sublimit of Insurance: $5,000,000
**Third Party Product Recall Liability Damages**
Aggregate Sublimit of Insurance: $5,000,000
**Third Party Product Recall Liability Damages**
Retained Limit: $350,000
Combined Retained Limit: $350,000

B.  Section **I. INSURING AGREEMENT** is amended to include the following additional provision:

**Product Recall Liability Damages Coverage**

Excess of the **Third-Party Product Recall Liability Damages** Retained Limit shown in the Declarations (as amended above) and subject to the terms and conditions of this policy, we shall reimburse you for **Third Party Product Recall Liability Damages** resulting directly from a **Recall of Insured Products**, provided you discover and give us notice of such **Recall of Insured Products** during the **Policy Period**. We have no duty to defend you against any **Claim** or **Suit** within the **Third-Party Product Recall Liability Damages** Retained Limit, but we do have the right, at our own expense, to participate with you in the investigation, negotiation, settlement, and defense of any such **Claim** or **Suit**. We have the right to participate with you in the

investigation, negotiation, settlement, and defense of any **Claim** or **Suit** above the **Third-Party Product Recall Liability Damages** Retained Limit, unless the limits of insurance applicable to this insuring agreement have been exhausted.

C. Solely for the purpose of this endorsement, Section **II. LIMITS OF INSURANCE** is amended to include the following additional provisions:

Subject to the **Third Party Product Recall Liability Damages** Aggregate Sublimit of Insurance shown in the Declarations (as amended above), the most we will pay for the total of all **Third Party Product Recall Liability Damages** in excess of the **Third Party Product Recall Liability Damages** Retained Limit shown in the Declarations (as amended above), as a result of any one **Recall of Insured Products**, is the **Third Party Product Recall Liability** Each **Recall of Insured Products** Sublimit of Insurance shown in the Declarations (as amended above).

Subject to the Policy Aggregate Limit stated in Item 3.F. of the Declarations, the **Third-Party Product Recall Liability Damages** Aggregate Sublimit of Insurance is the most we will pay under this endorsement for the sum of all **Third-Party Product Recall Liability Damages**.

The most you will pay for **Loss** caused by a single **Incident** and **Recall of Insured Products** combined is the Combined Retained Limit shown in the Declarations (as amended above). The Combined Retained Limit shall be borne by you and remain uninsured.

A portion of the Combined Retained Limit shall apply to any **Loss** that is limited by a sublimit of insurance. The portion of the Combined Retained Limit applicable to the sublimit of insurance shall be calculated by dividing the **Loss** attributable to the sublimit of insurance by the total amount of **Loss** under this policy multiplied by the Combined Retained Limit.

D. Solely for the purpose of this endorsement, Section **III. EXCLUSIONS**, Exclusion L. is deleted in its entirety and replaced with the following:

L. The policy does not provide coverage for any **Loss** or related **Incident Response Fees** arising out of, in whole or in part, any injury, damage or claim made by a third party, including any defense costs related to a third party lawsuit or any associated costs or costs or expenses related to any judicial, governmental or regulatory enquiry, except for any **Third Party Recall Expenses** or **Third Party Product Recall Liability Damages** covered by this policy.

\* \* \*

F. Solely for the purposes of this endorsement, Section **V. DEFINITIONS**, Definition N. **Loss** is deleted in its entirety and replaced by the following:

9

N. **Loss** means your reasonable and necessary **Third Party Product Recall Liability Damages**, provided such arises solely and directly out of a **Recall of Insured Products** and are incurred within twelve (12) months after your discovery of such **Recall of Insured Products**.

G. Section **V. DEFINITIONS** is amended to include the following additional definitions:

**Claim** means a written demand received by you seeking a remedy and alleging liability on your part for **Third Party Product Recall Liability Damages** to which this insurance applies.

**Compensatory Damages** means those amounts that you are required to pay a distributor, purchaser or user of **Insured Products** as reimbursement for such purchaser's costs incurred in connection with a **Recall of Insured Products**, other than liquidated, punitive or penalty damages.

**Defense Costs** means reasonable and necessary fees for: service of process and court costs and court expenses; pre- and post-judgment interest; attorneys' fees; cost of investigation services; costs of employing experts; costs for legal transcripts, copies of any public records, and costs of depositions and court-reported or recorded statements; and any similar fee, cost or expense; provided, however, **Defense Costs** shall not include our or your general overhead, the salary or benefits allocable to any of our or your employees, or the fees of any attorney who is our or your employee or under our or your permanent retainer.

**Third Party Product Recall Liability Damages** means: (a) any sums that you become legally obligated to pay as **Compensatory Damages**; and (b) your **Defense Costs** resulting from the investigation, negotiation, settlement or defense of a **Claim** or **Suit** brought by an entity other than you.

**Property Damage** means physical injury to or destruction of tangible property other than **Insured Products**.

**Recall of Insured Products** means the recall, removal, recovery of possession or control, withdrawal or disposal of, or purposeful destruction of **Insured Products** from or by a distributor, purchaser, retailer, wholesaler, or user of **Insured Products** solely because the use or consumption thereof has resulted in **Bodily Injury** or **Property Damage,** or because the use or consumption thereof poses actual and imminent danger of resulting in **Bodily Injury** or **Property Damage**. All **Third Party Product Recall Liability Damages** and **Defense Costs** arising from the same omission, introduction, or error will be considered as arising out of one **Recall of Insured Products**.

**Suit** means a civil proceeding seeking **Third Party Product Recall Liability Damages** to which this insurance applies, including without limitation any arbitration proceeding or other alternative dispute

resolution proceeding seeking **Third Party Product Recall Liability Damages** and to which you must submit or do submit with our consent.

## THE CLAIM

19.     Upon information and belief, MCF is a manufacturer of pet foods and treats, including Pup-Peroni pet treat products manufactured by MCF in its Spanish Fork, Utah facility for the JM Smucker Company ("JMS").

20.     Upon information and belief, potassium sorbate is used in JMS's formulation of the Pup-Peroni products.

21.     Upon information and belief, in 2019, JMS changed the potassium sorbate supplier for the potassium sorbate used in the Pup-Peroni products from a German supplier to a Chinese supplier.

22.     Upon information and belief, on or around July 8, 2020, JMS notified MCF of numerous consumer mold formulation complaints, including complaints about a powdery white mold found on a particular lot of a Pup-Peroni product.

23.     Upon information and belief, MCF and JMS continued to interact about the mold formulation problem and pursued a root cause investigation in July 2020, which continued into the summer of 2021.

24.     Upon information and belief, MCF and JMS continued to receive mold formulation complaints about dogs becoming ill or dying after consuming the affected Pup-Peroni products throughout the remainder of 2020 and well into the summer of 2021.

25.     Upon information and belief, MCF submitted an application for product contamination insurance to Allied World on or about November 3, 2020.

26.     In its application for product contamination insurance, MCF did not disclose to Allied World material information about the Chinese supplier of potassium sorbate, the long-term,

continuous mold formulation issues, and complaints of injured or dying dogs.

27.    The Policy's Policy Period incepted on January 2, 2021 and expired on January 2, 2022.

28.    Upon information and belief, in or around February 2021, JMS continued to investigate the long-term, continuous mold formulation problem and advised MCF that it had pulled mold formulation claims for Pup-Peroni products from 2019 and 2020.

29.    Upon information and belief, on or around June 1, 2021, JMS acknowledged that MCF 's priority was to determine the root cause of the long-term, continuous mold formulation problem while JMS continued to seek additional information about the mold formulation problem.

30.    Upon information and belief, on or around July 8, 2021, JMS advised MCF of an extremely high volume of mold formulation complaints. JMS requested from MCF all "analyticals" for all Pup-Peroni products and sizes produced over the past year.

31.    Upon information and belief, on or around July 15, 2021, JMS provided MCF with a timeline of mold formulation complaints dating from January 1, 2021, to July 14, 2021.

32.    Upon information and belief, on or around July 28, 2021, JMS conducted two withdrawals of certain Pup-Peroni pet treats due to the long-term, continuous mold formulation problem.

33.    Upon information and belief, the United States Food and Drug Administration ("FDA") determined, based on information submitted by JMS, that the Pup-Peroni product withdrawals should be classified as Class III.

34.    On August 3, 2021, MCF representatives tendered the claim to Allied World ("the Claim").

35.    Upon information and belief, on August 17, 2021, Doug Ford, President of MCF,

sent an email to certain MCF colleagues addressing the Pup-Peroni Mold Issues, in which he stated on information and belief,

> **What we know**
>
> Data between 2016 to 2018, potassium sorbate was consistent and in spec.
>
> Early 2019 potassium sorbate supplier was changed
>
> Early 2019 sorbic acid levels tested lower. And Stayed Consistently lower.
>
> Late March 2021 formula was changed to 25% Glycol and 75% glycerin.
>
> With proper inclusion of sorbic acid in finished product, mold will not grow at A/W levels of 0.76 and higher.
>
> A/W levels were higher in April 2021.
>
> We have had some mold complaints in the past on Pupperoni but not to this magnitude.
>
> The potassium sorbate is well mixed/dispersed throughout the dry blend supersack, emulsion, and finished product
>
> **What we don't know**
>
> Are we receiving a consistent potassium sorbate ingredient from the supplier.
>
> Why we are seeing some low data points of sorbic acid in the finished product.
>
> Could the blend of 25% Glycol, 75% Glycerin contribute to the problem.

36.    Upon information and belief, on August 20, 2021, Caron Watkins advised MCF colleague Leslie Hight regarding the JMS withdrawal of Pup-Peroni products,

> Attached is my response to the details surrounding the JMS market withdrawal for Pupperoni.
>
> Below and attached are the details I have on this matter.
>
> - Attached Excel file titled: Oct-Nov 2 MCF Consumer Complaint Data
>   - This file contains all MCF related consumer complaints on JMS (in 2017 the brand still belonged to Big Heart) products for FY 17, this information was provided to us by Big Heart QA Megan Switalski.

13

- *If you go to the data tab, column L and use the sorting filter, you will see that MCF only 10 complaints for mold in that year.*
- *Only 3 of those complaints were for Pupperoni items.*
- *12/18/2018 email from JMS QA Melissa Acri*
  - *JMS is asking for MCF to begin the approval process to bring the new Potassium Sorbate material in to our facility for use in JMS products.*
- *08/27/2020 email conversation between Melissa Acri and myself.*
  - *08/11/2020 – Saw elevated mold complaints.*
  - *MCF retains look good and sample we sent to the MCF lab for testing. MCF communicated that our sample did contain a low preservative of the preservative and asked for additional samples.*
- *03/16/2021 ATS from JMS*
  - *Instructions from JMS to switch all Pupperoni formulas to a Propylene Glycol/Glycerine blend.*
- *02/24/2021 – Email from JMS QA – Starting to see an increase in mold complaints.*
- *03/10/2021 – Email from JMS QA – calling out a specific production date of Pupp with mold complaints.*
  - *Mario Martinez responded on 03/11/2021.*
- *06/01/2021 – Email from JMS QA stating that product in their warehouse has been placed on hold for mold.*
  - *Original email was from 05/25/2021.*
  - *MCF/JMS QA teams looking in to the concerns, data, pictures, times, temps… information shared back and forth.*
- *06/01/2021 – MCF received word that mold has also been found on Triple Steak.*

37.    On January 21, 2022, Allied World sent a reservation of rights letter to MCF outlining the concerns described above.

38.    Based on Allied World's claim investigation, MCF has been experiencing a long-term, continuous mold problem with its Pup-Peroni products since before the Policy incepted.

39.    Based on Allied World's claim investigation, MCF misrepresented in its Application for product contamination insurance material information about the source of the potassium sorbate used in the Pup-Peroni products, the long-term, continuous mold formulation problem, and the growing list of injured or dying dogs, all of which began before the Policy incepted.

## THE POLICY APPLICATION

40.    On November 3, 2020, a MCF representative submitted the Application for product contamination insurance to Allied World.

41.    In the Application, MCF represented that it did not import product from China.

42.    In the Application, MCF represented that it had not experienced a previous product contamination incident, or any product recalls/withdrawals within the last ten years.

43.    In the Application, MCF represented that it did not have knowledge or information of any specific facts, which may give rise to an incident and/or claim or knowledge of any incident that would result in a claim if insurance had been in place.

44.    An actual controversy exists between Allied World and MCF regarding coverage under the Policy for the Claim.

### FIRST CAUSE OF ACTION FOR DECLARATORY JUDGMENT
**(Defendant's First Discovery Before the Policy's Policy Period)**

45.    Plaintiff repeats each and every allegation contained in paragraphs "1" through "44" with the same force and effect as if set forth fully herein.

46.    As the Policy is a claims-made-and-reported policy, the Policy's Insuring Agreement requires MCF to first discover an Incident during the Policy Period.

47.    Upon receipt of the mold formulation complaints and first discovery of the long-term, continuous mold formulation problem, on or before 2020, MCF first discovered an Incident before the Policy Period.

48.    The Policy's Policy Period began on January 2, 2021, several months after MCF first discovered the long-term, continuous mold formulation problem.

49.    Based on MCF's pre-policy first discovery of the long-term, continuous mold formulation problem, the Claim does not fall within the Policy's scope of coverage and is

15

precluded.

50.     Allied World respectfully requests from this Court a declaration of rights and obligations under the Policy.

51.     Declaratory relief will resolve outstanding issues regarding the obligations of Allied World under the Policy.

52.     Allied World has no other adequate remedy at law.

53.     Allied World therefore respectfully demands a declaratory judgment against MCF declaring that there is no coverage under the Policy for the Claim.

54.     Allied World is entitled to a declaratory judgment finding that there are no obligations under the Policy because MCF first discovered the long-term, continuous mold formulation problem before the Policy's Policy Period.

## SECOND CAUSE OF ACTION FOR DECLARATORY JUDGMENT
### (Defendant's Pre-Policy Knowledge Excludes Coverage)

55.     Plaintiff repeats each and every allegation contained in paragraphs "1" through "54" with the same force and effect as if set forth fully herein.

56.     As the Policy is a claims-made-and-reported policy, the Policy's Insuring Agreement requires MCF to first discover an Incident during the Policy Period.

57.     Under Exclusion C, the Policy excludes coverage for any Loss at issue arising out of, in whole or in part, an Incident or circumstance that could give rise to an Incident, which MCF discovered, knew, or should have reasonably known, prior to the inception of the Policy Period.

58.     Upon receipt of the mold formulation complaints on or before July 2020, MCF discovered, knew, or should reasonably have known of the long-term, continuous mold formulation problem or Incident or circumstances that could give rise to an Incident.

59.     The Policy incepted on January 2, 2021, several months after MCF first discovered,

knew, or should reasonably have known of the long-term, continuous mold formulation problem, Incident, or circumstances that could give rise to an Incident.

60.     Based on MCF's pre-policy knowledge of the long-term, continuous mold formulation problem, the Claim is excluded from coverage based on the application of Exclusion C.

61.     Allied World respectfully requests from this Court a declaration of rights and obligations under the Policy.

62.     Declaratory relief will resolve outstanding issues regarding the obligations of Allied World under the Policy.

63.     Allied World has no other adequate remedy at law.

64.     Allied World therefore respectfully demands a declaratory judgment against MCF declaring that there is no coverage under the Policy for the Claim.

65.     Allied World is entitled to a declaratory judgment finding that there are no obligations under the Policy because of MCF's pre-policy discovery of the long-term, continuous mold formulation problem, an Incident, or circumstances that could give rise to an Incident before the Policy incepted.

## THIRD CAUSE OF ACTION FOR DECLARATORY JUDGMENT
### (No Accidental Contamination Adverse Publicity Incident)

66.     Plaintiff repeats each and every allegation contained in paragraphs "1" through "65" with the same force and effect as if set forth fully herein.

67.     Under the Policy's Insuring Agreement, Allied World will reimburse the Insured for a Loss caused by an Incident first discovered and reported during the Policy Period.

68.     Under the Policy's Accidental Contamination Adverse Publicity Endorsement, the Policy requires in advertent or unintentional contamination of an Insured Product, which occurs

17

during or as a direct result of the Insured Product's production, packaging, or distribution, provided the use or consumption of the Insured Product has resulted in or would result in Bodily Injury or caused or would cause physical damage to or destruction of tangible property, other than the Insured Product itself. Accidental Contamination includes creating Adverse Publicity.

69.     During the claim investigation, MCF did not advise Allied World of any contamination event. Rather, MCF advised of a long-term, continuous mold formulation problem due to the use of potassium sorbate supplied by a Chinese supplier, since 2019, or the failure to properly formulate the Insured Product, which resulted in complaints of injured dogs on or before July 2020 and through the summer of 2021.

70.     As MCF's Claim does not involve inadvertent or unintentional mold contamination, the Claim does not qualify as an Accidental Contamination Adverse Publicity Incident.

71.     During the claim investigation, Allied World was not presented with any Adverse Publicity reporting of an actual or alleged Accidental Contamination.

72.     As MCF's Claim does not involve Adverse Publicity reporting of an actual or alleged Accidental Contamination, the Claim does not constitute an Accidental Contamination Adverse Publicity Incident.

73.     Allied World respectfully requests from this Court a declaration of rights and obligations under the Policy.

74.     Declaratory relief will resolve outstanding issues regarding the obligations of Allied World under the Policy.

75.     Allied World has no other adequate remedy at law.

76.     Allied World therefore respectfully demands a declaratory judgment against MCF

declaring that there is no coverage under the Policy for the Claim.

77.     Allied World is entitled to a declaratory judgment finding that the Claim does not qualify as an Accidental Contamination Adverse Publicity Incident.

### FOURTH CAUSE OF ACTION FOR DECLARATORY JUDGMENT
#### (No Governmental Determination Incident)

78.     Plaintiff repeats each and every allegation contained in paragraphs "1" through "77" with the same force and effect as if set forth fully herein.

79.     Under the Policy's Insuring Agreement, Allied World will reimburse the Insured for a Loss caused by an Incident first discovered and reported during the Policy Period.

80.     Under the Policy's Governmental Determination Endorsement, the Policy requires a voluntary withdrawal of an Insured Product from a purchaser or user of such Insured Product, which was conducted pursuant to a recommendation by the FDA based solely on a determination by the FDA that the use or consumption of such Insured Product was reasonably likely to result in physical damage to any domestic pet.

81.     On or about July 28, 2021, JMS conducted two withdrawals of certain Pup-Peroni products.

82.     Based on information submitted by JMS, the FDA classified JMS's Pup-Peroni withdrawals as Class III, which the FDA defines as "a situation in which use of or exposure to a violative product is not likely to cause adverse health consequences."

83.     Based on the FDA's classification of JMS's withdrawals of certain Pup-Peroni products as Class III, the Claim does not qualify as a Governmental Determination Incident.

84.     Allied World respectfully requests from this Court a declaration of rights and obligations under the Policy.

85.     Declaratory relief will resolve outstanding issues regarding the obligations of

Allied World under the Policy.

86.     Allied World has no other adequate remedy at law.

87.     Allied World therefore respectfully demands a declaratory judgment against MCF declaring that there is no coverage under the Policy for the Claim.

88.     Allied World is entitled to a declaratory judgment finding that the Claim does not qualify as a Governmental Determination Incident.

## FIFTH CAUSE OF ACTION FOR DECLARATORY JUDGMENT
### (No Coverage for Property Damage or Third-Party Product Recall Liability Damages)

89.     Plaintiff repeats each and every allegation contained in paragraphs "1" through "88" with the same force and effect as if set forth fully herein.

90.     Under the Policy's Insuring Agreement, Allied World will reimburse the Insured for a Loss caused by an Incident first discovered and reported during the Policy Period.

91.     Under the Policy's Third-Party Product Liability Damages Coverage Endorsement, Third Party Product Recall Liability Damages require that MCF be legally obligated to pay Compensatory Damages.

92.     During the claim investigation, MCF advised that it was not accepting liability for the long-term, continuous mold formulation issues or resulting damages.

93.     Under the Policy's Exclusion A, the Exclusion lists three categories of injuries or damages that are excluded from coverage under the Policy.

94.     To the extent coverage is provided under the Policy for the Claim, Exclusion A would exclude coverage for certain of the Loss claimed by MCF.

95.     Allied World respectfully requests from this Court a declaration of rights and obligations under the Policy.

96.     Declaratory relief will resolve outstanding issues regarding the obligations of

Allied World under the Policy.

97.    Allied World has no other adequate remedy at law.

98.    Allied World therefore respectfully demands a declaratory judgment against MCF declaring that there is no coverage under the Policy for the Claim.

99.    Allied World is entitled to a declaratory judgment finding that to the extent coverage is provided under the Policy for the Claim, certain portions of the Loss do not qualify or are excluded under the Third-Party Product Recall Liability Damages Coverage Endorsement and based on the application of Exclusion A.

<u>**SIXTH CAUSE OF ACTION FOR DECLARATORY JUDGMENT**</u>
<u>**(Defendant's Misrepresentation on the Application for Insurance)**</u>

100.    Plaintiff repeats each and every allegation contained in paragraphs "1" through "99" with the same force and effect as if set forth fully herein.

101.    MCF submitted to and Allied World relied upon the material information contained in MCF's Application for the purchase of product contamination insurance.

102.    In its Application, MCF represented to Allied World the material fact that it did not import product from China, even though the potassium sorbate used in the formulation of the Pup-Peroni products was imported from China since 2019.

103.    In its Application, MCF represented the material fact that it did not have knowledge or information of any specific facts, which may give rise to an incident and/or claim or knowledge of any incident that would result in a claim if insurance had been in place, despite knowledge, since before or as of July 2002, of a long-term, continuous mold formulation problem resulting in dog injuries arising from the consumption of certain Pup-Peroni products.

104.    Allied World relied on MCF's Application and the material misrepresentations in order to issue the Policy to MCF.

105.    Allied World respectfully requests from this Court a declaration of rights and obligations under the Policy.

106.    Declaratory relief will resolve outstanding issues regarding the obligations of Allied World under the Policy.

107.    Allied World has no other adequate remedy at law.

108.    Allied World therefore respectfully demands a declaratory judgment against MCF declaring that there is no coverage under the Policy for the Claim.

109.    Allied World is entitled to a declaratory judgment finding that there are no obligations under the Policy because MCF made material misrepresentations on its Application, upon which Allied World relied.

## **PRAYER FOR RELIEF**

WHEREFORE, Allied World respectfully requests that the Court enter judgment in its favor against Defendant as follows:

A.    On the First Cause of Action, a judicial declaration that MCF's first discovery of the long-term, continuous mold formulation problem before the Policy's Policy Period precludes coverage for the Claim;

B.    On the Second Cause of Action, a judicial declaration that the application of Exclusion C excludes coverage for the Claim;

C.    On the Third Cause of Action, a judicial declaration that the Claim does not qualify for coverage under the Policy as an Accidental Contamination Adverse Publicity Incident;

D.      On the Fourth Cause of Action, a judicial declaration that the Claim does not qualify for coverage under the Policy as a Governmental Determination Incident;

E.      On the Fifth Cause of Action, a judicial declaration that to the extent coverage is found under the Policy, certain Loss amounts do not fall within the scope of coverage provided under the Third-Party Product Recall Liability Damages Coverage Endorsement or are excluded based on the application of Exclusion A

F.      On the Sixth Cause of Action, a judicial declaration that MCF misrepresented or omitted material information in its product contamination Application, on which Allied World relied to issue the Policy to MCF.

G.      Prejudgment interest;

H.      Costs of suit and attorneys' fees; and

I.      Such other and further relief as this Court deems just and proper.

## **JURY DEMAND**

Allied World demands a jury trial for all claims properly tried to a jury.

Dated this 21st day of January 2022

PARR BROWN GEE & LOVELESS


 /s/ Stephen C. Mouritsen
Stephen C. Mouritsen
Briggs J. Matheson